1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   DAVE REINHARDT,                                  1:08-cv-00329 LJO DLB HC

10                            Petitioner,            FINDINGS AND RECOMMENDATION
                                                     REGARDING PETITION FOR WRIT OF
11          v.                                       HABEAS CORPUS

12                                                   [Doc. 1]
     FELLER, Warden,
13
                              Respondent.
14   _____/

15          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
16
     pursuant to 28 U.S.C. § 2254.
17
                                            BACKGROUND
18
            Following jury trial in the Fresno County Superior Court, Petitioner was convicted of four
19
     counts of assault with a firearm upon a peace officer (Ca. Pen. Code[1] § 245, subd. (d)(1)).  It was
20
     also found true that Petitioner personally used and intentionally discharged a firearm (§
21
     12022.53, subds. (b) and (c).).
22
            On December 1, 2005, Petitioner was sentenced to an aggregate term of fifty-two years in
23
     prison.  (2 CT 406; XIV RT 2229-2230.)  Petitioner filed a timely appeal and, on May 10, 2007,
24
     the Court of Appeal affirmed the judgment.  The California Supreme Court denied review.
25
     (Petition, Appendix A.)
26
            Petitioner filed state habeas corpus petitions in the California Superior Court, California
27

28          _____
                    [1]  All further statutory references are to the California Penal Code unless otherwise indicated.

                                                    1

1   Court of Appeal, and California Supreme Court, which were all summarily denied.  (Petition,

2   Appendix A.)

3        Petitioner filed the instant federal petition for writ of habeas corpus on March 7, 2008.

4   (Court Doc. 1.)  Respondent filed an answer to the petition on September 12, 2008, and

5   Petitioner filed a traverse on September 29, 3008.  (Court Docs. 36, 39.)

6                               STATEMENT OF FACTS[2]

7        Appellant's grandfather died in the 1980s, giving appellant's mother,
    Mariel Reinhardt, an irrevocable trust. The trust only would have passed assets to
8   appellant if his mother had died before his grandfather.

9        In March 2003, appellant was living in Oregon, while his parents, Don and
    Mariel Reinhardt, lived in Fresno, California. Appellant previously had called his
10  parents asking about his inheritance. On March 5, appellant angrily called his
    parents demanding his trust fund. In that recorded message, appellant told them
11  that if he remained homeless, they were going to "suffer problems the rest of
    [their] lives."
12

13       Either Don or Mariel called appellant's grandfather's probate attorney,
    William Coleman, asking that if appellant called him, he correct appellant's
    misconceptions about the trust. Appellant called Coleman around April 3 and
14  Coleman explained that the trust went to Mariel, the sole beneficiary, because she
    survived her father. Coleman also explained the key terms of the trust in a letter to
15  appellant.

16       Appellant again called Coleman on May 12, angrily demanding his trust.
    In that recorded message, appellant told Coleman that he was coming to Fresno
17  and that Coleman "better start installing bullet-proof glass in [his] office and [he
    better] carry a gun." Appellant called Coleman several more times demanding his
18  inheritance, and these conversations ended with some type of threat.

19       On September 9, appellant arrived in Fresno from Oregon. That morning,
    he appeared unexpectedly at his parents' home. He told his mother, the only one at
20  home, that he was there to take care of his inheritance, one way or another. Mariel
    testified that appellant became agitated when he saw work was being done on the
21  pool in the backyard, stating, "that's where you're spending my inheritance[.]" She
    explained that he did not have an inheritance.
22

23       Reinhardt family friend and retired police officer Ernie Rojas had noticed
    appellant walking into the Reinhardt house. When he reached his home two
24  blocks away, he called Mariel. As appellant was looking around the house, Mariel
    got the call. Rojas confirmed appellant's identity. Aware that appellant had
25  previously threatened his parents, Rojas asked Mariel if she was okay and she
    replied no. He offered to come over, and she accepted.

26

27     [2]  The Court finds the Court of Appeal correctly summarized the facts in its May 10, 2007 unpublished
    opinion.  Thus, the Court adopts the factual recitations verbatim as set forth by the California Court of Appeal, Fifth
28  Appellate District. See 2007 WL 1365982.

Before entering Mariel's house, Rojas heard arguing. Once inside, Mariel introduced appellant to Rojas. Appellant then continued talking to his mother about his inheritance. He started to curse and scream in a high voice that he wanted his inheritance. Mariel and Rojas tried to calm appellant, but according to Rojas, appellant threatened to "kick [Rojas's] ass." Appellant bolted down the hallway saying he was going to get a shotgun. Rojas grabbed Mariel and ran outside, leaving appellant alone in the house. Once they were at a safe distance, Rojas called the police on a cell phone and they waited for the police to arrive.

On September 9, the Reinhardt home contained a nine-millimeter handgun, 20 shotguns, and a 257 Roberts rifle for shooting big game from three or four miles away. A large quantity of ammunition for the weapons was scattered throughout the house.

At approximately 1:00 p.m., Fresno County Sheriff's Office Specialized Weapons and Tactics (SWAT) team leader Sergeant Craig Gularte was dispatched to assess the scene at the Reinhardt house. After speaking with the field supervisor, Sergeant Gularte requested additional units, including sniper units. Other team members who arrived on the scene throughout the afternoon included Detectives Kevin Lolkus and Tim Herzog. Deputies Juan Espinoza, Greg Siemans, Frank Harper, and Joel Walenmeier comprised two sniper teams. The SWAT team set up an inner perimeter to contain appellant in the house and an outer perimeter for crowd control. Other non-SWAT team personnel from the Sheriff's Office and the Fresno Police Department also assisted in the scene.

Connie Moore, a senior investigator and crisis negotiator with the Fresno County District Attorney's Office, was dispatched to the scene. The Crisis Negotiation Team (CNT) included a second negotiator, Detective David Lopez, who joined Investigator Moore at the country club where they set up a communications center to establish phone contact with appellant. They contacted appellant around 2:30 p.m. by calling the telephone in the house. Their negotiations were recorded.

Investigator Moore testified that during the initial contact, she let appellant tell her what his concerns were and what he needed or wanted. According to Investigator Moore, "[appellant] was wanting his inheritance. He believed he had [not] been given what he felt he rightfully deserved from a family inheritance, being savings bonds, trust funds, gold coins." Appellant told Investigator Moore that he was owed between $20,000 and $60,000 "a year from the time he was a young man ... gold coins ... an education at [ ] M.I.T."

Appellant knew that the SWAT team and sheriff's deputies were outside because he could see them through the windows. He could even describe the officers' location to Investigator Moore. Appellant told Investigator Moore that he had loaded the firearms in the house, which included a 257 Roberts rifle, handguns, and one shotgun, and placed them throughout the house. He also had boxes of ammunition. Appellant moved furniture around in the house to prevent entry. During the negotiations, appellant repeatedly threatened to kill: "you pull a gun on me and you know what? I will kill instantly." "I'm not worried about your little SWAT team. What I've got in my hand pokes holes right through bullet proof vests...." "Hey, I'll shoot 'em where they are."

Around 5:00 p.m., Sergeant Gularte had the electricity to the house shut off. The gas was shut off some time later. Sometime around 6:00 p.m., the SWAT team deployed flash bang noise diversionary devices on each side of the house.

3

All of these tactics were to get appellant's attention and get him to restart communications since the police had not heard from him for a couple of hours. Appellant started to talk to CNT again, but the dialogue began dropping off again.

To restart communication with appellant, Assistant Sheriff Tom Gattie deployed a robot at around 8:00 p.m. The robot stood approximately two-and-a-half feet tall and three feet across. It had tracks on the bottom for mobility, four adjustable lights and several cameras mounted on top for visibility, and a microphone and speaker for communication. It was operated by a toggle switch. It held in its claw a window punch for breaking glass. A 12-gauge automatic shotgun was mounted on the robot.

Sergeant Gularte watched the robot's progress through a monitor. The robot entered the backyard of the house and reached a sliding glass door. It turned on its lights, immediately contacting appellant. The team could see and hear him. Appellant was yelling at them to get the robot out of the house. Appellant fired four shotgun blasts at the robot. Appellant fired two other shots from the back of the house, to the right of Detective Herzog. Both Detective Herzog and Deputy Harper heard the rounds going over their heads. Seconds later, appellant moved to the front of the house and began firing shots.

At the same time, snipers Deputies Siemans and Espinoza were positioned prone on the ground under a tree 10 to 12 feet tall whose branches hung five to six feet from the ground. Deputy Siemans thought that appellant fired a shotgun round in his direction because he felt a "whoosh" go over his head. Deputy Espinoza saw one round ricochet off a patrol vehicle. Deputy Espinoza returned fire. Appellant was running through the house cursing and yelling that he knew where all the deputies were and that they had better get back. Deputy Siemans saw appellant move to another window illuminated by a candle in the room. Appellant was holding a rifle in his hands, leveling it at the deputies. Deputy Siemans fired into that window.

Subsequently, negotiators were able to communicate with appellant over the telephone but lost contact with appellant shortly after 11:00 p.m. Around that time, law enforcement deployed more gas devices and appellant responded by firing a volley of three to five rounds at Deputies Siemans and Espinoza. Deputy Siemans heard the crisp sound of a round fired from a high-power, long rifle snap above his head as leaves from the branches hanging a few feet above them fell on Deputy Espinoza's head.

Deputy Herzog was extracted from his location by an armored vehicle and joined Detective Lolkus at his location to provide lethal cover for him as he deployed gas into the house. They used barricade-penetrating, smokeless, micro-particle C.S. gas inside 40-millimeter large "ferret" rounds.

Around midnight, Detective Lolkus fired a ferret round into the house as Detective Herzog kneeled next to him. Detectives saw the muzzle blast as appellant fired a round from the house directly at them. Detective Herzog returned fire into the broken sliding glass door whence the shot came.

In all, Detective Lolkus fired seven ferret rounds into the house that night. Each time the team deployed gas, appellant returned fire. Appellant fired 40 to 50 rounds from the house sporadically throughout the night until approximately 2:00 or 3:00 a.m., at which time the Fresno Police Department relieved the sheriff's office. At 3:40 a.m., appellant surrendered to the police.

4

Sheriff's Detective Sergeant Toscano interviewed appellant at the sheriff's department headquarters. Appellant told him that the operator of the robot was telling him to pick up the telephone so that the police could communicate with him. Appellant admitted firing a nine-millimeter pistol, a 12-gauge shotgun, a 16-gauge shotgun, and a 257 bolt-action rifle. He also admitted firing at officers who had fired the ferret rounds. He said that he fired three or four rounds at the patrol car and when the tear gas impaired his vision, he grabbed the nine-millimeter pistol and fired it indiscriminately. Appellant also told Detective Toscano that he was carrying a rifle when he had earlier gone outside to retrieve some paperwork.

Appellant said that he took the law into his own hands because his complaint about his inheritance was not being resolved. He told Detective Toscano that when the officers fired the ferret rounds he felt that it was a threat, and therefore, he was going to return fire and stop the threat. If that meant to kill an officer, "that happens in those occasions," in a gun battle.
Appellant appeared lucid, had not been drinking, and was not taking any medication. Appellant stated that he had smoked "a little weed," but said that he knew exactly what he was doing during the incident that day.

### Defense case

Clinical psychologist Harold Seymour evaluated appellant and opined that he suffered from a "delusional disorder with paranoid and grandiose features." Central to the disorder is

> "[T]hinking that's inconsistent with how other people think. In the case of a delusional disorder, these thought processes, the ideas associated with them are pretty firmly fixed and entrenched so the person truly believes the thoughts that they have are, in fact, real."

In appellant's case, Seymour concluded, he believed that he was owed an inheritance. According to Seymour, once a delusional person locks onto a theme or idea, they stay with it even in the face of overwhelming, contrary evidence.[3]

Assistant Sheriff Gattie testified that the robot was armed with a 12-gauge automatic shotgun on September 9. Once the robot entered the house, appellant shot the robot, which became inoperable, except that the robot still allowed for two-way voice communication.

Appellant testified on his own behalf. He testified that when he turned 35, he found out about Coleman from his parents. He contacted Coleman and received a copy of trust documents from him. According to appellant, he was to receive one third of his inheritance when he turned 35, 40, and 45. He was to receive $5,000 a month or $60,000 a year until age 35. Appellant claimed that his parents were keeping the money from him, thereby financially abusing him. Appellant acknowledged that the document entered into evidence in his case entitled him to nothing, but claimed that it was only part of the original document. Appellant testified that he did not trust his parents or the document in their hands because they could make it say whatever they wanted.

Appellant testified that when Rojas came over on September 9, he did not

---

[3] Appellant was found competent to stand trial on two separate occasions.

threaten Rojas. Rather, Rojas threatened him by picking up the cordless telephone and "saying do what I say and leave immediately or I'm going to call the police and have you arrested." Appellant claimed that he went to the back room to get another phone to talk to 911.

Appellant testified that he had intermittent contact with Investigator Moore but that she was not doing anything. He admitted shooting 12 or 13 shots from the home. He claimed that he fired the 257 Roberts at the patrol car in front of the house, he shot the robot four times each with the 257 Roberts and a shotgun, and he fired a 16-gauge shotgun and a nine-millimeter, both of which he claimed jammed. He claimed that when he shot the robot, he had no intention of shooting at the police officers.

After he shot the robot, appellant testified, the police opened fire at the front and back of the house. Appellant said that he shot the lights out of the patrol car so police could no longer use them to illuminate the house. When the ferret rounds of gas were fired into the house, appellant testified that he went to the back bedroom to escape the gas and wrapped a wet shirt around his face to breathe.

Appellant claimed that he never fired in the direction from which the officers fired because he never saw their fire. He also denied shooting high above the officers' heads. Appellant testified that of the 13 shells that the police found in the house, eight were for bullets fired into the robot, three into the police car, and one each into the living room and hallway walls.

When asked why he resisted as he had, appellant said that he had been to jail a few times and that the legal system in Fresno used excessive force. When asked why he did not surrender when ordered to, appellant claimed that "basically Fresno County likes to lock you up for exercising your freedom of speech when there's no evidence against you." Appellant reported having been jailed seven or eight times when he was a teenager, mostly on traffic matters.

Appellant testified that if he had it all to do over again, he would not back down. "They instigated what happened. I would probably do the same thing again, okay, in the way of standing my ground there. I wouldn't back down like this and just let them cart me off." Appellant denied being delusional and had no doubt that a trust fund existed for him. Appellant claimed that the whole event happened because he wanted someone to listen to his side of the story, he wanted protection of the law. Appellant testified that he wanted to let the police know that he had weapons, and they should not come into the house. He claims, however, that when the armed robot came in, he had no choice but to defend himself. He denied assaulting or trying to kill the police officers.

## DISCUSSION

A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

6

violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.

28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

(1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with

respect to a state prisoner's claim that was adjudicated on the merits in state court.  Williams v.

Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States;" or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State Court

proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations

omitted).  "Rather, that application must be objectively unreasonable."  Id. (citations omitted).

1    While habeas corpus relief is an important instrument to assure that individuals are

2  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

3  (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

4  criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

5  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

6  factual determinations must be presumed correct, and the federal court must accept all factual

7  findings made by the state court unless the petitioner can rebut "the presumption of correctness

8  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

9  S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

10  110 F.3d 1380, 1388 (9th Cir. 1997).

11  C.    Instructional Error

12    Petitioner contends that his constitutional rights were violated by the trial court's

13  instruction to the jury that self-defense was not available as a defense under state law unless the

14  initiator of a non-deadly conflict withdrew, once the initiator's adversary escalated the conflict.

15    1. *State Court Decision*

16    Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth

17  Appellate District and California Supreme Court.  Because the California Supreme Court issued

18  a summary denial, this Court "looks through" that decision and presumes it adopted the reasoning

19  of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst

20  v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)

21  (establishing, on habeas review, "look through" presumption that higher court agrees with lower

22  court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson,

23  217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court

24  opinion in determining whether state court's rejection of petitioner's claims was contrary to or an

25  unreasonable application of federal law under § 2254(d)(1)).

26  ///

27    In denying Petitioner's claim the Court of Appeal held:

28        Appellant contends, however, that the trial judge was also required to give

8

an instruction based upon the principles enunciated in *People v. Hecker* (1895) 109 Cal. 451 (*Hecker*), abrogated on other grounds by statute as stated in *People v. Hardin* (2000) 85 Cal.App.4th 625, 631-634.

In *Hecker,* the defendant was tried for murder of Patrick Riley but pled self-defense. (*Hecker, supra,* 109 Cal. at p. 455.) Riley had lost two horses, and he offered a reward to those who find and return his horses. Hecker found the horses and turned them over to Riley's wife. (*Id.* at pp. 455-456.) Riley suspected that Hecker had stolen the horses and hidden them away in expectation of a reward. (*Id.* at p. 456) Riley accused Hecker of being a horse thief and refused to give Hecker the reward. Hecker then decided to take back the horses until he was paid. (*Ibid.*) He armed himself because he thought that Riley would try to cause trouble, and went to Riley's place. (*Id.* at p. 457) A confrontation occurred that eventually resulted in the death of Riley. (*Id.* at pp. 457-458.)

The California Supreme Court held that the trial court erred in instructing the jury on self-defense. According to the Court,

"Where one is the first wrongdoer, but his unlawful act is not felonious, as a simple assault upon the person of another, ..., even though forcible, and this unlawful act is met by a counter assault of a deadly character, the right of self-defense to the first wrongdoer is not lost. For, as his acts did not justify upon the part of the other the use of deadly means for their prevention, his killing by the other would be criminal, and one may always defend himself against a criminal attempt to take his life. But in contemplation of the weakness and passions of men, and of the provocation, which, though inadequate, was wrongfully put upon the other, it is the duty of the first wrongdoer before he can avail himself of the plea to have retreated to the wall, to have declined the strife and withdrawn from the difficulty, and to have killed his adversary, under necessity, actual or apparent, only after so doing. If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense. [Citations.]" (*Id.* at p. 464.)

Thus, according to appellant, although he did not "decline[ ] the strife and withdraw[ ] from the difficulty," he was entitled to a claim of self-defense because he "unlawfully initiated or joined the contest with no thought of causing death or great bodily harm (e .g., a fist fight)" and the police suddenly escalated the standoff into a deadly encounter when the police sent in the armed robot.

An instruction on this *Hecker* principle would be justified only where substantial evidence supports findings that: (1) appellant did not make a felonious assault or create the appearances justifying a deadly response; (2) sending the armed robot was an escalation of the standoff into a deadly encounter; and (3) sending in the robot was sudden and unanticipated so as to prevent appellant from having the opportunity to withdraw safely. (*Hecker, supra,* 109 Cal. at p. 464; *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201.) The record in this case, however, does not support any of those findings.

First, appellant did create appearances justifying possible deadly response. During the negotiations with the police, appellant threatened to kill the officers. And, although appellant did not fire any shots until the robot was sent into the house, he did load the firearms in the house and placed them throughout the house. Thus, because police officers reasonably believed that appellant was armed

and willing to kill police officers, they were entitled to surround the house and aim deadly weapons at appellant.

Second, sending in the armed robot was not an escalation of the conflict into a deadly standoff because there is no evidence that the armed robot fired on appellant or aimed its shotgun at appellant. Moreover, there was no escalation as the police officers were already aiming firearms at the house.

Finally, sending in the robot was not so sudden or unanticipated as to prevent appellant from withdrawing safely. The standoff began at approximately 1:00 p.m. and the robot was not sent into the house until approximately 8:00 p.m. The robot did not penetrate the house's entrance until 30 to 45 minutes later. Appellant could have informed the police that he was withdrawing or surrendering during the 30 to 45 minutes that the robot took to break into the house. For example, he could have gone to the front of the house, away from the robot, and waved a white flag to surrender.

Thus, the trial court did not err in not giving the *Hecker* instruction sua sponte.

(Opinion, 2007 WL 1365982 *7-*8.)

2. *Analysis*

First, to the extent Petitioner challenges the appellate court's holding under California law-the applicability of the Hecker principle, it is not subject to review by this Court. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Brodheim v. Rowland, 993 F.2d 716, 717 (9th Cir. 1993) (noting that federal courts are bound by a state court's interpretation of its own penal statutes). A writ of habeas corpus is available under section 2254(a) only on the basis of some transgression of federal law binding on the state courts. Engle v. Isaac, 456 U.S. 107, 119 (1982); see also Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Dugger v. Adams, 489 U.S. 401, 409 (1989) ("the availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution.").

Second, Petitioner's claim that his federal constitutional rights to due process and trial by jury were violated by the trial court's failure to provide the Hecker rule instruction, fails on the merits. In reviewing such claim, a habeas court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" Henderson

1   v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730 (1977) (quoting Cupp v. Naughten, 414 U.S. 141,

2   146-47, 94 S.Ct. 396 (1973)); California v. Roy, 519 U.S. 2, 5, 117 S.Ct. 337, 338 (1996)

3   (challenge in habeas to the trial court's jury instructions is reviewed under the standard in Brecht

4   v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) - whether the error had a substantial

5   and injurious effect or influence in determining the jury's verdict.). The burden of demonstrating

6   that an erroneous instruction was so prejudicial that it will support a collateral attack on the

7   constitutional validity of a state court's judgment is even greater than the showing required to

8   establish plain error on direct appeal." Id.  In this case Petitioner's burden is "especially heavy,"

9   because "[a]n omission or an incomplete instruction is less likely to be prejudicial than a

10  misstatement of law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

11      Here, the state appellate court concluded that the trial court had no duty to instruct sua

12  sponte on the availability of self defense to one who initiates a non-deadly conflict because there

13  was not substantial evidence to support such a theory.  Due process requires only that the trial

14  court provide an instruction if it determines there is "evidence sufficient for a reasonable jury to

15  find in [the defendant's] favor." Matthews v. United States, 485 U.S. 58, 63 (1988).  Petitioner

16  does not demonstrate nor does this Court find that the appellate court's determination of the facts

17  was unreasonable.  Accordingly, the omission of such instruction did not "so infect the entire

18  trial that the resulting conviction violated due process" Estelle, 502 U.S. at 71-72, and the state

19  courts' determination of this issue was not contrary to, or an unreasonable application of, clearly

20  established Supreme Court precedent.

21  D.    Ineffective Assistance of Counsel-Failure Request Instruction Based on Prior Threats

22      Petitioner contends that he was denied the effective assistance of counsel because he did

23  not seek an instruction on a state law doctrine dealing with prior threats against Petitioner.

24      1. State Court Decision

25      Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth

26  Appellate District and California Supreme Court.  Because the California Supreme Court issued

27  a summary denial, this Court "looks through" that decision and presumes it adopted the reasoning

28  of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst

1    v. Nunnemaker, 501 U.S. at 804-05 & n. 3 (establishing, on habeas review, "look through"

2    presumption that higher court agrees with lower court's reasoning where former affirms latter

3    without discussion).

4            The appellate court held, in relevant part:

5                    In *People v. Minifie* (1996) 13 Cal.4th 1055, the California Supreme Court
6            held that a defendant could introduce evidence that he was threatened previously
             by third parties to demonstrate that it was reasonable for him to act in self-
             defense. In subsequent cases, the courts have concluded that a defendant could act
7            more quickly or more harshly than normal because of prior antecedent threats. For
             example, in *People v. Pena* (1984) 151 Cal.App.3d 462 ( *Pena* ), the court
8            concluded that a defendant was entitled to an antecedent threats instruction where
             the defendant was threatened by the victim, who was half a foot taller and 80
9            pounds heavier than defendant and was a trained martial artist.

10                   Here, however, appellant presented no witnesses, documentary evidence,
             or even circumstantial evidence supporting his accusation that sheriff's deputies
11           had previously threatened or assaulted him in jail. The fact that appellant had been
             incarcerated "quite a few times for nothing in Fresno" says nothing about being
12           threatened or assaulted. Appellant's general statements that officers use excessive
             force or are rough also do not constitute substantial evidence that appellant was
13           subject to excessive force.

14                   Thus, given the lack of supporting evidence, appellant cannot show error
             or prejudice for trial counsel's failure to seek an antecedent threat instruction.
15
                     Therefore, we also reject this claim of ineffective assistance of counsel.
16
     (Opinion, 2007 WL 1365982 *9.)
17
             2.  *Analysis*
18
             The law governing ineffective assistance of counsel claims is clearly established for the
19
     purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,
20
     151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective
21
     assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.
22
     668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,
23
     the petitioner must show that counsel's performance was deficient, requiring a showing that
24
     counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by
25
     the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's
26
     representation fell below an objective standard of reasonableness, and must identify counsel's
27
     alleged acts or omissions that were not the result of reasonable professional judgment
28

1  considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

2  (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges

3  a strong presumption that counsel's conduct falls within the wide range of reasonable

4  professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

5  Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

6      Second, the petitioner must show that counsel's errors were so egregious as to deprive

7  defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

8  also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

9  ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

10  1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

11  was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

12  (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

13  have been different.

14      A court need not determine whether counsel's performance was deficient before

15  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

16  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

17  prejudice, any deficiency that does not result in prejudice must necessarily fail.

18      Ineffective assistance of counsel claims are analyzed under the "unreasonable

19  application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle, 215 F.3d

20  1058, 1062 (2000).

21      Little more need be said than stated by the appellate court.  Petitioner's claim was not

22  supported factually by any evidence and his generalized accusations were insufficient to warrant

23  an antecedent threat instruction.  Accordingly, there is no basis to claim that counsel was

24  ineffective or that he was prejudiced by the failure to request an unwarranted instruction, and the

25  state courts' determination of this issue was not contrary to, or an unreasonable application of

26  Strickland.

27  E.    Ineffective Assistance Counsel-Failure to Request Instruction Based on Hecker

28      Petitioner contends that he was denied effective assistance of counsel because counsel

13

1    failed to request an instruction on the <u>Hecker</u> principle. Petitioner's claim is without merit.

2        As explained by the appellate court, because there was no basis for an instruction under

3 the holding of <u>Hecker</u>, Petitioner cannot show that counsel was incompetent or that he was

4 prejudiced by the failure to request such instruction. Accordingly, Petitioner's claim fails on the

5 merits. <u>Strickland</u>, 466 U.S. 687-688; 28 U.S.C. § 2254(d)(1), (2).

6 F.     <u>Cumulative Error</u>

7        Petitioner contends that the three preceding claims cumulated to amount to a

8 constitutional violation. The California Court of Appeal rejected Petitioner's claim finding any

9 alleged errors harmless, and the California Supreme Court summarily denied review.

10        The United States Supreme Court has not recognized a claim of cumulative error to grant

11 relief pursuant to a habeas corpus petition. <u>See</u> <u>Lorraine v. Coyle</u>, 291 F.3d 416, 447 (6th Cir.

12 2002) ("Supreme Court has not held that distinct constitutional claims can be cumulated to grant

13 habeas relief.") Although the Ninth Circuit recognizes such a claim,[4] in the instant case, because

14 there was no reversible error, Petitioner is not entitled to habeas corpus relief on his claim of

15 cumulative error. <u>See</u> <u>United States v. Carreno</u>, 363 F.3d 883, 889 n.2 (9th Cir. 2004) (noting that

16 the cumulative error doctrine does not apply where there was no error); <u>Mancuso v. Olivarez</u>,

17 292 F.3d 939, 957 (9th Cir. 2002) (holding where there are no errors, there can be no cumulative

18 error). Consequently, Petitioner's claim fails.

19 G.     <u>Ineffective Assistance of Counsel-Failure Raise Fourth Amendment Violation</u>

20        Petitioner contends that he was denied effective assistance of counsel because counsel

21 failed to contest his arrest on a theory that no warrant was obtained.

22 ///

23        1. *Lack of Exhaustion*

24        Respondent initially argues that Petitioner failed to raise this claim in any state court, and

25

26        [4] <u>Whelchel v. Washington</u>, 232 F.3d 1197, 1212 (9th Cir. 2000) (recognizing cumulative error standard but relief granted based upon single error); <u>see also</u> <u>Daniels v. Woodford</u>, 428 F.3d 1181, 1214 (9th Cir. 2005) (granting

27 relief based on cumulative error); <u>Karis v. Calderon</u>, 283 F.3d 1117, 1132 (9th Cir. 2002) (rejecting cumulative error claim as meritless); <u>Thomas v. Hubbard</u>, 273 F.3d 1164, 1180 (9th Cir. 2001) (granting relief based on cumulative

28 error), overruled on other grounds, <u>Payton v. Woodford</u>, 229 F.3d 815, 828 n.11 (9th Cir. 2002).

1  the claim is therefore unexhausted.  Respondent is correct.  Although Petitioner raised two other

2  independent ineffective assistance of counsel claims, he did not raise the instant claim.

3  Ineffective assistance of counsel claim, however, must separately present each basis to be

4  exhausted.  Moormann v. Schriro, 426 F.3d 1044, 1056 (9th Cir. 2005); Carriger v. Lewis, 971

5  F.2d 329, 333-334 (9th Cir. 1992) (en banc).  Therefore, the instant claim is unexhausted because

6  Petitioner did not "fairly present" his federal claim to the highest state court with jurisdiction to

7  consider it.  Anderson v. Harless, 459 U.S. 4, 6 (1982); 28 U.S.C. § 2254(b)(1).

8  　　　2. *Lack of Merit*

9  　　　Notwithstanding the failure to exhaust the instant claim, it is clear the claim is without

10  merit.  See Cassett v. Stewart, 406 F.3d 614, 623 (9th Cir. 2005) (federal court may deny an

11  unexhausted claim on the merits where it is perfectly clear that the applicant does not raise even a

12  colorable federal claim.).

13  　　　A claim of ineffectiveness may be based upon counsel's failure to object to evidence,

14  including an objection on Fourth Amendment grounds.  Kimmelman v. Morrison, 477 U.S. 365,

15  382 (1986).  Proof of the ineffectiveness claim requires a showing that the Fourth Amendment

16  objection had merit, but such a showing of merit is insufficient in and of itself to demonstrate

17  that counsel was ineffective for not making the objection.  Id. at 382 ("Although a meritorious

18  Fourth Amendment issue is necessary to the success of a Sixth Amendment claim like

19  respondent's, a good Fourth Amendment claim alone will not earn a prisoner federal habeas

20  relief.").  The defendant instead must further show the failure to object amounted to "gross

21  incompetence."  Id.

22  　　　Petitioner has failed to demonstrate that every reasonable trial counsel would have raised

23  an objection to the lack of a warrant for a person who is not in his own residence, and was in fact

24  a burglar in another person's residence at the time of the arrest.  United States v. Erickson, 991

25  F.2d 529, 533 (9th Cir. 1993).  Moreover, even if such challenge were made there is no showing

26  of any evidence that would have been suppressed as a result of the alleged Fourth Amendment

27  violation.  Accordingly, it is clear Petitioner's claim fails under Strickland and must be denied.

28  H.　　Ineffective Assistance Counsel-Failure to Raise Petitioner's Mental Competency

1    Petitioner contends that he was denied effective assistance of counsel because counsel

2  delayed the trial by requesting inquiry into his competency to stand trial.

3    Petitioner raised this claim on collateral review to the California Court of Appeal, Fifth

4  Appellate District and California Supreme Court, both issued summary denials.  In this instance,

5  AEDPA's strict standard of review is relaxed when the state court reaches a decision on the

6  merits but provides no reasoning to support its conclusion. Under such circumstances, the federal

7  court must "independently review the record to determine whether the state court clearly erred in

8  its application of Supreme Court law." Brazzel v. Washington, 491 F.3d 976, 981 (9th Cir.2007),

9  quoting Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d 976,

10  982 (9th  Cir.2000) ("Federal habeas review is not de novo when the state court does not supply

11  reasoning for its decision, but an independent review of the record is required to determine

12  whether the state court clearly erred in its application of controlling federal law.").

13    The record reveals that there were two delays prior to trial.  With regard to the first delay,

14  Petitioner was arraigned on September 12, 2003.  On September 24, 2003, Petitioner sought to

15  waive the assistance of counsel.  (RT 1-7.)  Upon discussion with Petitioner, the court declared a

16  doubt as to Petitioner's competency and suspended the proceedings to determine the question of

17  competency-ordering examination by two mental health experts.  (RT 9-11; CT 5-6.)   After

18  reviewing the reports by the two medical experts, the Court declared Petitioner incompetent and

19  suspended the criminal proceedings on November 26, 2003.  (RT 16; CT 9.)  Then on September

20  13, 2004, the trial court found Petitioner competent to stand trial and reinstated the criminal

21  proceedings.  The first delay totaled 354 days.

22    Petitioner's claim that counsel caused the first delay is simply not supported by the

23  record.  Petitioner presents nothing to demonstrate that every reasonable attorney would have

24  interfered with the court's decision to suspend the proceedings to determine Petitioner's

25  competency.  Accordingly, Petitioner has failed to demonstrate that counsel was ineffective or

26  that he was prejudiced by any delay in the proceedings, and his claim fails on the merits.

27  Strickland, 466 U.S. at 687, 696-697.

28    With regard to the second delay, on November 4, 2004, Petitioner moved a different trial

1   judge to relieve counsel, which was denied.  (CT 20-21; Mardsen Transcript 601-613.)

2   Thereafter, both defense counsel and the court declared doubt as to Petitioner's competence, and

3   again the proceedings were suspended to determine his competency.  (CT 20-21; RT 614-619.)

4   On June 27, 2005, Petitioner was found competent to stand trial and the proceedings were

5   reinstated.  (CT 32.)  This delay totaled 237 days.

6          Although Petitioner may not have liked the fact that his counsel raised doubt as to his

7   competency, this does not render his performance incompetent.  Moreover, there is no evidence

8   to demonstrate that there is a reasonable probability of a different result if trial counsel had

9   objected to the delay.  Nor has Petitioner demonstrated any resulting prejudice for the delay and

10  his claim fails under Strickland, 466 U.S. at 696-697.

11  I.      Ineffective Assistance Counsel-Failure Present Certain Evidence, Conflict Interest

12         Petitioner contends that trial counsel was ineffective because (1) he did not present

13  certain alleged evidence at trial; (2) he suffered from an alleged conflict of interest; and (3) he

14  did not object to an instruction.  (Petition at 6B.)

15         Petitioner raised this claim on collateral review to the California Court of Appeal, Fifth

16  Appellate District and California Supreme Court, both issued summarily denials.  In this

17  instance, AEDPA's strict standard of review is relaxed when the state court reaches a decision on

18  the merits but provides no reasoning to support its conclusion, and this Court must

19  "independently review the record to determine whether the state court clearly erred in its

20  application of Supreme Court law."  Brazzel v. Washington, 491 F.3d at 981, *quoting* Pirtle v.

21  Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d at 982 .

22         1. *Alleged Unpresented Evidence*

23         Petitioner testified on his own behalf at trial.  He stated that he reported to the Dos Palos

24  Police Department that, as a child, he witnessed his adoptive father commit a murder.  (RT 1757-

25  1759, 1764-1765.)  According to Petitioner, had the ex-police chief of Dos Palos been called to

26  testify, he would have verified Petitioner's claim that the murder victim's body was found in the

27  Delta Mendota Canal shot in the face by a shotgun.  (RT 1764-1765.)  It appears that Petitioner

28  contends the sheriff's secretary could have testified that he called law enforcement numerous

17

1   times to try to get a police report filed.  (Petition at 10.)

2        Petitioner also stated that he called his adoptive parents regarding his trust fund

3   inheritance "probably 500 times" from Oregon.  (RT 1794-1796.)  He contends that telephone

4   records would substantiate the fact.  Petitioner further claims that production of his grandfather's

5   will would have substantiated his claim that he was due to inherit a collection of silver coins,

6   savings bonds, and gold when he turned thirty-five years old.  (RT 1786-1787.)

7        Generally, trial counsel has the "duty to make reasonable investigations or to make a

8   reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at

9   688.  This includes a duty to investigate the defendant's "most important defense," Sanders v.

10  Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994), and a duty adequately to investigate and introduce

11  into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that

12   question to undermine confidence in the verdict. Hart v. Gomez, 174 F.3d 1067,

13   1070 (9th Cir.1999).   However, claims of failure to interview or call witnesses are deficient

14  where there is no showing what the interview would obtain and how it might change the

15  outcome.  United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987).

16       Petitioner testified as to his version of the facts, and the prosecution did not refute his

17  testimony.  Thus, even if certain evidence was not presented, substantiation of Petitioner's

18  testimony was not necessary.  Therefore, it would be objectively reasonable for a defense

19  attorney not to present additional proof of the facts as alleged by Petitioner, and Petitioner's

20  claim is without merit.

21       Moreover, the facts alleged by Petitioner were irrelevant to his guilt or innocence.

22  Substantiating Petitioner's version of the facts would not amount to disproof (or create a

23  reasonable doubt) as to the elements of the charged crimes, because the fact that Petitioner's

24  adoptive father was a murderer or whether Petitioner was entitled to some form of inheritance

25  had no bearing on the elements of the charged offenses.[5]  Therefore, it would not be apparent to

26

27       [5] The charge of attempted premeditated murder of a peace officer required proof only that Petitioner weighed the question of unlawfully killing and the reasons for and against it, and nevertheless decided to kill, and made a direct but ineffectual act to kill who he knew or should have known were police officers.  (CALJIC No.

28  8.68.)  The charge of assault by firearm upon a peace officer required proof only that Petitioner willfully and

18

1   reasonable jurists that every trial counsel would have sought to introduce irrelevant evidence.

2   Nor is it reasonably probable that such conduct would have made a different or more favorable

3   result reasonably probable.

4          2. *Alleged Conflict*

5          Petitioner contends that defense counsel had a conflict of interest with his adoptive

6   parents because he was in contact with them.  (Petition at 7 of Attachment A Statement of Facts.)

7          "To establish a sixth amendment violation based on a conflict of interest, a defendant

8   must show that (1) counsel actively represented conflicting interests, and (2) an actual conflict of

9   interest adversely affected his lawyers performance."  Cuyler v. Sullivan, 446 U.S. 335, 350

10  (1980).  Petitioner must prove an actual conflict "through a factual showing on the record."

11  Morris v. California, 966 F.2d 448, 455 (9th Cir. 1992).

12         Petitioner's claim that defense counsel was in contact with his adoptive parents is nothing

13  more than a conclusory allegation, which properly warrants denying relief outright.  Jones v.

14  Gomez, 66 F.3d 199, 204-205 (9th Cir. 1995).  Petitioner does not develop his argument or point

15  to any evidence that rendered counsel's performance ineffective or demonstrate any prejudice by

16  the alleged contact with his adoptive parents.

17         3. *Alleged Improper Instruction*

18         Petitioner contends that defense counsel was not effective because he did not object to the

19  inclusion of the following language in the jury charge: "Neither side is required to call as

20  witnesses all persons who may have been present at any of the events disclosed by the evidence

21  or who may appear to have some knowledge of these events.  Neither side is required to produce

22  all objects or documents mentioned or suggested by the evidence."  (Petition at 8-10 of

23  Attachment A Statement of Facts.)

24  _____

25  unlawfully committed an act which by its nature, and which Petitioner knew, would probably and directly result in
    the application of physical force on who he knew or should have known were police officers on duty.  (CALJIC Nos.

26  9.00 & 9.20.)
            Thus, the alleged evidence that a murdered man was found in the Delta Mendota Canal, Petitioner called the

27  sheriff's officer on numerous occasions to have a police report filed, and the production of his grandfather's will had
    no tendency to prove or disprove any elements of attempted murder or assault.  Thus, there is no reasonable

28  probability that such irrelevant evidence could have aided Petitioner's defense in any way or changed the outcome.
    United States v. Berry, 814 F.2d at 1409.

1    Petitioner reasons that the instruction allowed the prosecutor to keep evidence beneficial

2    to his case from the jury.  (Id. at 8.)  Specifically, Petitioner contends the prosecutor withheld

3    parts of the negotiator's tape wherein Petitioner demanded that police internal affairs or an

4    outside agency "get involved."  (Id. at 8-9.)  Petitioner is mistaken.

5    Petitioner has simply failed to demonstrate how the challenged instruction allowed, or did

6    not allow, anything in the way of conduct by the prosecutor only.  In fact, if there was evidence to

7    presented, or a lack of evidence presented, he was free to raise such a challenge.  There was

8    simply no basis for counsel to challenge the instruction, and his claim fails on the merits.

9    Strickland, 466 U.S. at 687-688.

10   J.       Equal Protection Claim

11   It appears Petitioner renews his state court claim that (1) he was denied his Fourteenth

12   Amendment right to equal protection of the law, because Fresno County: (a) refused to file a

13   police report to provide to the Federal Bureau of Investigation (F.B.I.) regarding his stolen U.S.

14   Treasury Savings Bonds, (b) allowed his adoptive parents to use the legal system to "get rid of"

15   him, the victim, and (c) refused to prosecute them for "continuance [sic] child abuse, murder and

16   stealing [his] savings bonds" (Petition at 6B); and (2) that he was denied a fair hearing to prove

17   that county officials violated the law and that he was the victim who rightly defended himself

18   against the county by standing his ground in trying to report a crime (Petition at 6C).

19   Petitioner raised this claim on collateral review to the California Court of Appeal, Fifth

20   Appellate District and California Supreme Court, both issued summarily denials.  In this

21   instance, AEDPA's strict standard of review is relaxed when the state court reaches a decision on

22   the merits but provides no reasoning to support its conclusion, and this Court must

23   "independently review the record to determine whether the state court clearly erred in its

24   application of Supreme Court law." Brazzel v. Washington, 491 F.3d at 981, *quoting* Pirtle v.

25   Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d at 982 .

26   The Equal Protection Clause requires that persons who are similarly situated be treated

27   alike. City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87

28   L.Ed.2d 313 (1985). An equal protection claim may be established in two ways. First, a plaintiff

establishes an equal protection claim by showing that the defendant has intentionally

discriminated on the basis of the plaintiff's membership in a protected class. See, e.g., Lee v. City

of Los Angeles, 250 F.3d 668, 686 (9th Cir.2001). Under this theory of equal protection, the

plaintiff must show that the defendants' actions were a result of the plaintiff's membership in a

suspect class, such as race. Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir.2005).

If the action in question does not involve a suspect classification, a plaintiff may establish an

equal protection claim by showing that similarly situated individuals were intentionally treated

differently without a rational relationship to a legitimate state purpose. Village of Willowbrook v.

Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); San Antonio School

District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972); Squaw Valley

Development Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir.2004); SeaRiver Mar. Fin. Holdings,

Inc. v. Mineta, 309 F.3d 662, 679 (9th Cir.2002). To state an equal protection claim under this

theory, a plaintiff must allege that: (1) the plaintiff is a member of an identifiable class; (2) the

plaintiff was intentionally treated differently from others similarly situated; and (3) there is no

rational basis for the difference in treatment. Village of Willowbrook, 528 U.S. at 564. If an

equal protection claim is based upon the defendant's selective enforcement of a valid law or rule,

a plaintiff must show that the selective enforcement is based upon an "impermissible motive."

Squaw Valley, 375 F.3d at 944; Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th

Cir.1995).

    In this case, Petitioner makes no claim that he is a member of a protected class. Petitioner

must therefore show, in part, that he was intentionally treated differently from others similarly

situated. It appears that Petitioner reasons that he was treated differently from other victims, who

tried to report a crime, and who have, as a result, received protection from the legal system.

(Petition at 6B-6C.)  However, Petitioner has not proven that the decision to prosecute him was

based on anything other than a general policy to prosecute any person who invades a home and

then fires shots at police-without exception in this case, simply because Petitioner was under the

belief that his adoptive parents (owners of the property) were depriving him of his inheritance.

Petitioner has simply failed to establish an equal protection violation.

1    K.    Prosecutorial Misconduct

2          As raised in the state courts, Petitioner contends that (1) the Constitution compelled the

3    prosecutor to conduct more investigation and not to use an instruction to withhold favorable

4    evidence, and (2) the Constitution barred the prosecutor from arguing that Petitioner was a

5    delusional aggressor as to whose conduct the state law doctrine of self-defense did not apply.

6    (Petition at 6C; see Lodged Doc. Nos. 8, 10)

7          Petitioner raised this claim on collateral review to the California Court of Appeal, Fifth

8    Appellate District and California Supreme Court, both of which issued summarily denials.  In

9    this instance, AEDPA's strict standard of review is relaxed when the state court reaches a

10   decision on the merits but provides no reasoning to support its conclusion, and this Court must

11   "independently review the record to determine whether the state court clearly erred in its

12   application of Supreme Court law." Brazzel v. Washington, 491 F.3d at 981, *quoting* Pirtle v.

13   Morgan, 313 F.3d 1160, 1167 (9th Cir.2002); Delgado v. Lewis, 223 F.3d at 982 .

14         Failure to provide exculpatory evidence: The prosecution's suppression of evidence

15   favorable to the accused violates due process when the evidence is material to guilt or to

16   punishment.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Evidence is material "only if there

17   is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

18   proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  "[A]

19   constitutional error occurs, and the conviction must be reversed, only if the evidence is material

20   in the sense that its suppression undermines confidence in the outcome of the trial."  Id. at 678.

21         However, although the Government may not conceal exculpatory evidence from a

22   defendant, "it does not place any burden upon the Government to conduct a defendant's

23   investigation or assist in the presentation of the defense's case. *See United States v. Herbst*, 641

24   F.2d 1161, 1168 n.11 (5th Cir.), cert. denied sub nom. *Griffin v. United States*, 454 U.S. 851, 70

25   L.Ed. 2d 141, 102 S.Ct. 292 (1981)."  United States v. Marrero, 90 F.2d 251, 261 (5th Cir. 1990).

26         As explained previously, Petitioner's grandfather's social security number was simply

27   immaterial to the question of guilt and in no way undermined confidence in the outcome of the

28   trial.  In addition, the Constitution did not require the prosecutor to present an entire copy of the

1  tape of Petitioner's negotiations with police, as the tape was fully disclosed to Petitioner during

2  discovery.  Moreover, as explained in sections C, D, and E, *supra*, Petitioner's self-defense

3  theories were not applicable under California law and there is no showing the prosecutor violated

4  the Constitution by arguing that Petitioner was the aggressor.

5  L.    Actual Innocence Claim

6         For the first time here, Petitioner contends the Constitution does not permit his custody

7  because there is evidence that he is innocent, i.e., evidence that he was right regarding

8  entitlement to an inheritance which was stolen from him.  (Petition at 6D.)

9         1. *Lack of Exhaustion*

10        Respondent correctly argues that Petitioner did not present this claim in any state court

11  and this claim is therefore unexhausted.  28 U.S.C. § 2254(b)(1).

12        2. *Lack of Merit*

13        Notwithstanding the failure to exhaust the instant claim, it is clear the claim is without

14  merit.  Cassett v. Stewart, 406 F.3d at 623 (federal court may deny an unexhausted claim on the

15  merits where it is perfectly clear that the applicant does not raise even a colorable federal claim.).

16        There is no clearly established law that supports an independent claim of actual innocence

17  subject to review under § 2254.  See House v. Bell, 547 U.S. 518, 554-555 (2006) (referring to a

18  freestanding claim of innocence as the "question left open in *Herrera [v. Collins*, 506 U.S. 390

19  (1993)]").  Without binding authority finding a freestanding claim of actual innocence,

20  reasonable jurists could reject the legal proposition that the Constitution is implicated by a

21  defendant's claim of guilt or innocence after being convicted in a trial free of constitutional

22  defect.  Moreover, there is simply no showing that, even if a clear standard exists for such claim,

23  Petitioner satisfied it.  Petitioner testified to his version of the facts and based upon a review of

24  the evidence, the jury found the factual evidence supported a finding of guilt, and Petitioner's

25  inheritance-based defense has no bearing on the elements of the charged offenses.  Accordingly,

26  Petitioner's claim fails on the merits.

27  M.    False Evidence Claim

28        Again, for the first time here, Petitioner contends that because he was entitled to an

1    inheritance which was stolen from him, the evidence upon which he was convicted was false.

2        1. *Lack of Exhaustion*

3        Respondent correctly argues that this claim was not presented to any state court and is

4    therefore unexhausted.  28 U.S.C. § 2254(b)(1).

5        2. *Lack of Merit*

6        Nonetheless, as with the prior claim, it is clear the claim is without merit.  Cassett v.

7    Stewart, 406 F.3d at 623 (federal court may deny an unexhausted claim on the merits where it is

8    perfectly clear that the applicant does not raise even a colorable federal claim.).

9        Petitioner contends that the prosecutor knowingly admitted false evidence.  The knowing

10   use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional.

11   Napue v. Illinois, 360 U.S. 264 (1959).  Petitioner bears the burden of "alleg[ing] facts showing

12   that there was knowing use of the perjured testimony by the prosecution." Pavao v. Cardwell,

13   583 F.2d 1075, 1076-1077 (9th Cir. 1978).  In the context of the presentation of false evidence,

14   Petitioner must prove all of the following: (1) the alleged evidence was indeed false; (2) the

15   prosecution knew or should have known of its falsity; and (3) there is a reasonable likelihood that

16   the false evidence affected the jury's decision.  See e.g. United States v. Zuno-Arce, 339 F.3d

17   886, 889 (9th Cir. 2003).

18       Here, beyond his self-serving declaration, Petitioner fails to demonstrate that any of the

19   evidence presented at trial was false.  Absent such showing, Petitioner's claim fails on the merits.

20   The mere fact that Petitioner believed he was entitled to an inheritance does not in any way

21   render his actions lawful or demonstrate that the evidence to the contrary was false.

22                                    RECOMMENDATION

23       Based on the foregoing, it is HEREBY RECOMMENDED that:

24       1.      The instant petition for writ of habeas corpus be DENIED;

25       2.      All pending motions be DENIED as MOOT; and

26       3.      The Clerk of Court be directed to enter judgment in favor of Respondent.

27       This Findings and Recommendation is submitted to the assigned United States District

28   Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

the Local Rules of Practice for the United States District Court, Eastern District of California.
Within thirty (30) days after being served with a copy, any party may file written objections with
the court and serve a copy on all parties.  Such a document should be captioned "Objections to
Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served
and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the
objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §
636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time
may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
Cir. 1991).


     IT IS SO ORDERED.

**Dated:   December 24, 2008**              **/s/ Dennis L. Beck**
                                  UNITED STATES MAGISTRATE JUDGE